IN THE SUPREME COURT OF NORTH CAROLINA

 2021-NCSC-164

 No. 156PA20

 Filed 17 December 2021

 STATE OF NORTH CAROLINA

 v.
 DAVID WARREN TAYLOR

 Appeal pursuant to N.C.G.S. § 7A-31 from a unanimous decision of the Court

 of Appeals, 270 N.C. App. 514, vacating the judgment entered 23 January 2018 by

 Judge Gary M. Gavenus in Superior Court, Macon County. Heard in the Supreme

 Court on 24 March 2021.

 Joshua H. Stein, Attorney General, by Nicholas S. Brod, Assistant Solicitor
 General, and Ryan Y. Park, Solicitor General, for the State-appellant.

 Glenn Gerding, Appellate Defender, by Aaron Thomas Johnson, Assistant
 Appellate Defender, for the defendant-appellee.

 MORGAN, Justice.

¶1 On 24 August 2016, defendant David Warren Taylor posted a string of angry

 comments on his personal Facebook social media page. The messages conveyed

 defendant’s forceful disagreement with a decision by the area’s elected District

 Attorney, Ashley Welch, not to criminally prosecute the parents of a child after the

 youngster’s death under unusual circumstances in Macon County. During the

 diatribe, defendant consumed an unspecified, but apparently significant, quantity of
 STATE V. TAYLOR

 2021-NCSC-164

 Opinion of the Court

 beer. Most of defendant’s posts contained pointed, inflammatory, but essentially

 political critiques of District Attorney Welch and various aspects of the Macon County

 judicial system.1

¶2 Some of the posts contained troubling language. In one of them, defendant

 promised that District Attorney Welch “will be the first to go” when a purportedly

 impending “rebellion against our government” occurs. In another comment,

 defendant declared that “[i]f [District Attorney Welch] won’t do anything, then the

 death to her as well.” Defendant also made numerous references to the firearms that

 he owned and his willingness to use them against law enforcement officers if he were

 ever “raided.”

¶3 Within a couple of hours of publishing his final Facebook message, defendant

 reconsidered the wisdom of broadcasting his unadulterated opinions on social media,

 in what has been called “the modern public square.” Packingham v. North Carolina,

 137 S. Ct. 1730, 1737 (2017). However, before defendant could delete the rant from

 his Facebook page, one of his Facebook “friends”—a detective in the Macon County

 Sheriff’s Office—became concerned that the messages harbored content more sinister

 than intemperate venting. The detective took screenshots of defendant’s posted

 comments and sent them to District Attorney Welch and the Macon County Sheriff,

 1 For proper attribution, I recognize and appreciate the significant contribution which

 Justice Earls has made to the introductory overview, the “Background,” and the “Analysis”
 segments of this opinion.
 STATE V. TAYLOR

 2021-NCSC-164

 Opinion of the Court

 who then contacted the North Carolina State Bureau of Investigation (SBI). The next

 day, SBI investigators interviewed defendant at his office. That afternoon, defendant

 was arrested and later indicted under N.C.G.S. § 14-16.7(a) for “knowingly and

 willfully” threatening to kill a court officer. N.C.G.S. § 14-16.7(a) (2019). Defendant

 was subsequently convicted of the charged offense. He received a suspended sentence

 of 24 months of supervised probation and a $1,000 fine. Defendant appealed, and the

 Court of Appeals concluded that his conviction violated the First Amendment. The

 State has appealed to this Court.

¶4 At its core, this case presents a single question: Does the Free Speech Clause

 of the First Amendment to the United States Constitution2 protect defendant from

 being convicted solely for publishing the messages contained in his Facebook posts?

 We conclude that it does, and therefore determine that his messages are shielded by

 the First Amendment. Accordingly, while the Court of Appeals was correct to vacate

 defendant’s conviction, there remain questions for a properly instructed jury, so we

 reverse and remand the matter for a new trial.

 I. Background

 A. The Facebook posts

¶5 Defendant and Welch were familiar with one another prior to the events which

 2 This pertinent portion of the First Amendment states: “Congress shall make no law

 . . . abridging the freedom of speech or of the press. . . .” U.S. Const. amend I.
 STATE V. TAYLOR

 2021-NCSC-164

 Opinion of the Court

 spawned this case. Defendant was a Macon County resident who supported Welch in

 her campaign for the elected office of District Attorney. Defendant worked in an office

 building which was close to the Macon County Courthouse where the two occasionally

 would see each other during work breaks. Defendant and Welch were friendly, even

 though their conversations often centered on “political” subjects.

¶6 Defendant’s favorable view of District Attorney Welch changed on 24 August

 2016 when he learned that she would not be pursuing criminal charges against the

 parents of a Macon County child who had died a few months earlier. Defendant’s

 concerns were rooted in the tragic details of the child’s death. According to the

 parents, the two-and-a-half-year-old boy had “some sniffles” when they tucked him

 in for a nap. When the parents returned, the youngster was not breathing. The

 parents claimed that they took their son directly to the hospital, but when they

 arrived at the emergency room, the child was already deceased and “incredibly

 decomposed.” Welch was concerned that the child had been “killed or neglected,” and

 consequently ordered an autopsy. To Welch’s surprise, the parents’ account was

 confirmed. The autopsy determined that the child’s death and subsequent rapid

 physical decomposition did not result from any maltreatment or abuse. Lacking

 evidence of criminal conduct, Welch declined to press charges against the child’s

 parents.

¶7 When defendant learned of District Attorney Welch’s decision to refrain from
 STATE V. TAYLOR

 2021-NCSC-164

 Opinion of the Court

indicting the parents, he was demonstrably skeptical. He described the

representation that the child had “died of a virus” as “a load of “F**king shit.”

Defendant utilized the social media site Facebook as the primary vehicle by which to

express his frustration. Defendant initiated a litany of comments on his assessment

of the situation with the following Facebook entry:3

 [Defendant]: So I learned today that the couple Who
 brought their child Into that er whom had been dead to the
 point that the er room had to be closed off due to the smell
 of the dead child Will face no Charges. I regret the day I
 voted for the new DA with this outcome. This is totally
 sickening to know that a child, whether by Ashley Welch’s
 decision or not is not granted this type of Protection in our
 court system. Im tired of standing back and seeing how our
 judicial system works. I voted for it to change and
 apparently it never will. With this people question why a
 rebellion against our government is coming? I hope those
 that are friends with her share my post because she will be
 the first to go, period and point made.

In response, a few of defendant’s Facebook friends communicated their shared

agreement with defendant’s views. Defendant himself then resumed his commentary:

 [Defendant]: Sick is not the word for it. This folks is how
 the government and the judicial system works, Now U
 wonder why I say if I am raided for whatever reason like
 the guy on smoke rise was. When the deputy ask me is it
 worth it. I would say with a Shotgun Pointed at him and a
 ar15 in the other arm was it worth to him? Who cares what
 happens to the person I meet at the door. I’m sure he won’t.
 I would open every gun I have. I would rather be carried by
 six than judged by twelve. This folks is how politicians

 3 Given the subject matter of this case and the relevance of defendant’s exact posting,

we have only minimally altered his quotes to ensure they are understandable.
 STATE V. TAYLOR

 2021-NCSC-164

 Opinion of the Court

 want u to believe is ok. Im tired of it. What I do Training
 wise from this point is ur fault. And yes I know I have
 friends on [Facebook] whom see this. I hope they do! Death
 to our so called judicial system since it only works for those
 that are guilty! U want me come and take me.

When one of his Facebook friends expressed surprise that these events could occur in

Macon County, defendant responded, “This is how politics works. That’s why my

harsh words to her and any other that will Listen and share it To her [Facebook]

page.” Another member of defendant’s Facebook network called for “vigilante justice,”

which was punctuated by markedly numerous exclamation marks. Defendant

replied:

 If that what it takes[.] I will give them both the [mountain]
 justice they deserve. Regardless of what the law or courts
 say. I’m tired of this political bullshit. If our head
 prosecutor won’t do anything then the death to her as well.
 Yea I said it. Now raid my house for communicating threats
 and see what they meet. After all those that flip Together
 swim together. Although this isn’t a house or pond they
 want to fish in.

The author of the “vigilante justice” comment posted that he was “still waiting.”

Again, defendant responded:

 For what [ ]? [District Attorney Welch] to reply? She won’t
 because she is being paid a 6 digit income standing Outside
 the courthouse smoking a cigarette. She won’t try a case
 unless it gets her TV time. Typical politician. Notice that
 none of them has responded yet? Although I’m sure My
 house is being Monitored right about now! I really hope
 They are ready for what meet them at the front door.
 Something tells Me they aren’t!
 STATE V. TAYLOR

 2021-NCSC-164

 Opinion of the Court

 As other Facebook observers continued to “like” his posts and comment on them,

 defendant published four more messages:

 It can start at my house. Hell this has to start somewhere.
 If the courts won’t do it as have been proven. Then yes it Is
 up to the people to administer justice! I’m always game to
 do so. They make new ammo everyday! Maybe you need to
 learn what being free is verse being a puppet of the
 government. If u did u would might actually be happy! I
 think we both know of someone who will like this Comment
 Or Like this post.

 I know people who said the er room had to be shut down
 because the smell of they dead kid stunk up the entire er
 room. Our DA and Police department chose not to press
 charges. Yea that’s the facts. Welcome to America. The
 once great great nation.

 Don’t get me started on this. The court system and Most
 importantly western nc justice system is useless. It’s all
 about money to the courts than it Is about justice. It is time
 for old Time mtn justice! Yes [ ] I said it. Now let Them
 knock on my door.

 [ ] don’t get me Started about The Tony Curtis killing. Of
 Course No charges will Be brought against him. He is what
 the county considers to be a upstanding citizen of the
 community. Typical politics at its best. What he did was no
 different to the killing On 411 north over a year ago. What
 was his name? Fouts?

¶8 On the following day of 25 August 2016, the Macon County Sheriff’s Office, the

 Macon County Courthouse, and District Attorney Welch herself all took precautions

 to ensure her safety. Additional deputies were stationed within and around the

 courthouse. Welch stopped walking through the office building where defendant

 worked. Further, she asked a realtor who had posted a video tour of Welch’s home to
 STATE V. TAYLOR

 2021-NCSC-164

 Opinion of the Court

 remove the video, fearing that it could reveal identifying information from which

 defendant could glean Welch’s address.

¶9 Later in the same day, a Special Agent from the SBI went to defendant’s

 workplace to interview defendant. During the meeting, defendant reiterated his

 complaint that “no charges were brought against the parents” of the child who died,

 which defendant described as “sickening.” Defendant claimed that he did not mean

 to threaten or harm District Attorney Welch and that he deleted the social media

 posts because “he was friends with someone on Facebook who was friends with the

 parents’ children.” He then apologized for any concern that his posts had raised and

 asked the SBI agent to tell Welch that defendant was sorry.

¶ 10 Shortly after the interview concluded, police arrested defendant at his place of

 employment. Defendant was subsequently indicted pursuant to N.C.G.S. § 14-16.7(a)

 for “knowingly and willfully mak[ing] a[ ] threat to inflict serious bodily injury upon

 or to kill a[ ] . . . court officer[.]”

 B. The trial

¶ 11 Defendant’s trial began in January 2018. After the State concluded the

 presentation of its case, defendant moved to dismiss the matter on First Amendment

 grounds. He argued that the State had not shown that he had communicated any

 “true threat” against District Attorney Welch, which he contended was a threshold

 requirement in order to obtain a criminal conviction under N.C.G.S. § 14-16.7(a),
 STATE V. TAYLOR

 2021-NCSC-164

 Opinion of the Court

 consistent with First Amendment protections. Defendant defined a true threat as “a

 statement in which the defendant means to communicate a serious intention of

 committing an act of unlawful violence against a particular person.” The trial court

 denied defendant’s dismissal motion. Defendant did not elect to present evidence on

 his own behalf. He renewed his motion to dismiss on First Amendment grounds at

 the close of all of the evidence, which the trial court again denied.

¶ 12 During the jury charge conference, defendant requested jury instructions

 which distinguished “political hyperbole” from “true threats,” based on his contention

 that the First Amendment forbade his conviction in the event that the jury could not

 find that he had communicated a true threat. The State objected to the proposed

 instruction, as it asserted that the “proper venue” and time for defendant to raise any

 First Amendment arguments would be “if upon conviction to take that up on appeal.”

 The State also argued that the First Amendment was irrelevant because N.C.G.S.

 § 14-16.7(a) reflected the General Assembly’s determination that “making any

 threats towards . . . court officials . . . is unacceptable.” In the State’s view,

 defendant’s proposed jury instructions would impermissibly “rewrite [N.C.G.S. § 14-

 16.7(a)] to comport with his interpretation of the First Amendment requirements.”

 Instead, the State asked the trial court to instruct the jury in accordance with the

 language of the statute, proposing an instruction which contained the phrase that

 there was “no requirement of proof to show that the threat was made in a manner
 STATE V. TAYLOR

 2021-NCSC-164

 Opinion of the Court

 and under circumstances which would cause a reasonable person to believe it is likely

 to be carried out.” The trial court agreed with the State’s stance and therefore

 instructed the jury that in order to convict defendant, the State only needed to prove

 that defendant “knowingly and willfully made a threat to kill the alleged victim.”

¶ 13 The jury found defendant guilty of the charged offense. The trial court

 sentenced defendant to a term of incarceration of 6 to 17 months, which was

 suspended upon 24 months of supervised probation and payment of a fine of

 $1,000.00. Defendant appealed.

 C. The Court of Appeals opinion

¶ 14 Upon defendant’s appeal, the Court of Appeals panel unanimously agreed that

 the First Amendment required the State to prove that defendant communicated a

 true threat. State v. Taylor, 270 N.C. App. 514, 517 (2020). In vacating the verdict

 and judgment entered against defendant at trial, the lower appellate court also

 unanimously agreed that N.C.G.S. § 14-16.7(a) was unconstitutional as applied to

 convict defendant for his Facebook posts. Id. The Court of Appeals concluded that the

 State was required to prove that defendant possessed both a general and specific

 intent to threaten District Attorney Welch in order to establish that defendant had

 communicated a true threat. In so concluding, the Court of Appeals held that in order

 to prove that defendant communicated a true threat, the State was required to prove

 that he communicated a statement which was objectively threatening and that he
 STATE V. TAYLOR

 2021-NCSC-164

 Opinion of the Court

subjectively intended to threaten District Attorney Welch when he posted the

messages on Facebook.4 The State needed to establish the objective component that

defendant’s statements “would be understood by people hearing or reading it in

context as a serious expression of an intent to kill or injure” District Attorney Welch

and that defendant “intended that the statement be understood as a threat” in order

to satisfy the subjective component. Id. at 557 (quoting United States v. Bagdasarian,

652 F.3d 1113, 1118 (9th Cir. 2011)). The State failed, in the view of the Court of

Appeals, to prove the existence of either prong because (1) defendant’s Facebook posts

were “simply not [ ] statement[s] that a reasonable person would understand as

Defendant expressing a serious intent to kill D.A. Welch,” and (2) “the record evidence

could not have supported a finding that Defendant's intent in posting his comments

was to cause D.A. Welch to believe Defendant was going to kill her.” Id. at 581.5 The

 4 For ease of reading, we use the terms “objective” and “subjective,” and their
derivatives, throughout this opinion, rather than the terms “general intent” and “specific
intent,” to refer to the two elements that defendant alleges that the State must prove in order
to convict him for communicating a true threat.
 5 Additionally, the Court of Appeals held that the First Amendment’s “true threats”

requirement was an essential element of N.C.G.S. § 14-16.7(a). Because “[i]t is well
established that a defendant cannot receive a fair, i.e., constitutional, trial, unless all
essential elements of the crime charged are submitted to the jury and found beyond a
reasonable doubt,” the lower appellate court concluded that the trial court’s failure to give
any instruction incorporating First Amendment requirements rendered defendant’s
conviction as constitutionally infirm. Taylor, 270 N.C. App. at 541. The State has conceded
this point and agrees that defendant’s conviction must be vacated. Accordingly, the only
question before this Court is whether to affirm the Court of Appeals decision vacating the
trial court judgment and remanding for entry of a judgment of acquittal, or to reverse the
Court of Appeals decision, vacate the trial court’s judgment, and remand for a new trial.
 STATE V. TAYLOR

 2021-NCSC-164

 Opinion of the Court

 Court of Appeals majority ultimately adopted defendant’s argument that his social

 media messages were protected by the First Amendment because the State did not

 prove that defendant communicated a true threat against the elected official Welch.

¶ 15 In a concurring opinion, a member of the Court of Appeals panel reached the

 same outcome in the case as the majority of the panel did, concluding as a matter of

 law that defendant’s messages were not objectively threatening. Id. at 591 (Dietz, J.

 concurring in part).

¶ 16 We granted the State’s petition for discretionary review.

 II. Analysis

 A. Applicable free speech principles

¶ 17 The Free Speech Clause of the First Amendment, as incorporated to apply to

 the states through the Due Process Clause of the Fourteenth Amendment, provides

 that the government “shall make no law . . . abridging the freedom of speech.” U.S.

 Const. amend. I. This provision serves as a bulwark against governmental action

 which threatens the robust exchange of ideas that is “the indispensable condition[ ]

 of nearly every other form of freedom.” Palko v. Connecticut, 302 U.S. 319, 327 (1937),

 overruled on other grounds by Benton v. Maryland, 395 U.S. 784 (1969). Laws

 restricting speech “because of disapproval of the ideas expressed” are typically

 unconstitutional. R.A.V. v. City of St. Paul, Minn., 505 U.S. 377, 382 (1992); see also

 Regan v. Time, Inc., 468 U.S. 641, 648–49 (1984) (“Regulations which permit the
 STATE V. TAYLOR

 2021-NCSC-164

 Opinion of the Court

 Government to discriminate on the basis of the content of the message cannot be

 tolerated under the First Amendment.”). “Content-based regulations”—including

 criminal statutes which target speech on the basis of its content—“are presumptively

 invalid.” R.A.V., 505 U.S. at 382.

¶ 18 However, “our society, like other free but civilized societies, has permitted

 restrictions upon the content of speech in a few limited areas.” Id. at 382–83. Certain

 categories of expression “can, consistently with the First Amendment, be regulated

 because of their constitutionally proscribable content.” Id. at 383. These

 “constitutionally proscribable” categories of expression include obscenity, Miller v.

 California, 413 U.S. 15 (1973), defamation, New York Times Co. v. Sullivan, 376 U.S.

 254 (1964), fighting words, Chaplinsky v. New Hampshire, 315 U.S. 568 (1942),

 incitement, Brandenburg v. Ohio, 395 U.S. 444 (1969), and true threats, Watts v.

 United States, 394 U.S. 705 (1969). If defendant’s Facebook posts contained any true

 threats, then it is indisputable that he could be criminally punished for the content

 of his messages, provided that “the basis for the content discrimination consists

 entirely of the very reason the entire class of speech at issue is proscribable.” R.A.V.,

 505 U.S. at 388. If Taylor’s Facebook posts did not contain any true threats, then his

 expression is shielded by the First Amendment. We are therefore compelled to

 identify the characteristics of true threats which allow the State to prosecute one kind

 of expression understood to be entirely lacking in constitutional value, while
 STATE V. TAYLOR

 2021-NCSC-164

 Opinion of the Court

 preventing N.C.G.S. § 14-16.7(a) from “becoming an instrument for the suppression

 of those ‘vehement, caustic, and sometimes unpleasantly sharp attacks’ which must

 be protected if the guarantees of the First and Fourteenth Amendments are to

 prevail.” Monitor Patriot Co. v. Roy, 401 U.S. 265, 277 (1971) (quoting New York

 Times Co. v. Sullivan, 376 U.S. 254, 270 (1964)). Speakers need clarity on the type of

 communication which constitutes a true threat so that they can engage in protected

 First Amendment activities while ensuring their speech is lawful.

¶ 19 Neither this Court nor the Supreme Court of the United States has ever

 explicitly defined the scope of the true threats exception to the First Amendment.

 However, our analysis is guided by the high court’s articulation of general principles

 in the few cases addressing the existence of true threats which it has decided, as well

 as the many cases involving other categories of constitutionally forbidden speech.

¶ 20 As the Supreme Court of the United States has repeatedly emphasized, when

 tasked with drawing the boundary line between constitutionally protected speech and

 criminally proscribable expression, the risk of hampering public debate should be a

 court’s foremost concern. “Our profound national commitment to the free exchange of

 ideas, as enshrined in the First Amendment, demands . . . an area of breathing space

 so that protected speech is not discouraged.” Harte-Hanks Commc'ns, Inc. v.

 Connaughton, 491 U.S. 657, 686 (1989) (extraneity omitted). This demand for

 “breathing space” is especially pronounced when governmental action risks targeting
 STATE V. TAYLOR

 2021-NCSC-164

 Opinion of the Court

 or dissuading “[s]peech concerning public affairs,” which is “more than self-

 expression; it is the essence of self-government.” Snyder v. Phelps, 562 U.S. 443, 452

 (2011). See also Fed. Election Comm'n v. Wisconsin Right to Life, Inc., 551 U.S. 449,

 457 (2007) (“In drawing that line [between protected and proscribable expression],

 the First Amendment requires us to err on the side of protecting political speech

 rather than suppressing it.”). To assure adequate “breathing space,” the Court has

 “narrowed the scope of the traditional categorical exceptions” to the First

 Amendment, even though the Court continues to recognize their existence. R.A.V.,

 505 U.S. at 383.

¶ 21 In deciding whether the First Amendment allows defendant to be convicted

 under N.C.G.S. § 14-16.7(a) for his Facebook posts, we “interpret the language that

 [the General Assembly] chose ‘against the background of a profound national

 commitment to the principle that debate on public issues should be uninhibited,

 robust, and wide-open.’ ” Watts v. United States, 394 U.S. 705, 708 (1969) (quoting

 New York Times Co. v. Sullivan, 376 U.S. 254, 270 (1964)). The various cases which

 expound upon this principle convey a clear message that we must avoid a definition

 of the true threats exception to the First Amendment which sweeps too broadly.

 Unduly enlarging any categorical exception to the First Amendment “would have

 substantial costs in discouraging the uninhibited, robust, and wide-open debate that

 the First Amendment is intended to protect.” Rogers v. United States, 422 U.S. 35, 48
 STATE V. TAYLOR

 2021-NCSC-164

 Opinion of the Court

 (1975) (Marshall, J., concurring) (extraneity omitted). Our examination and

 interpretation of the limited case law expressly addressing the true threats doctrine

 must respect and revere these fundamental First Amendment principles.

 1. The true threats exception

¶ 22 The Supreme Court of the United States first recognized the true threats

 exception to the First Amendment in Watts v. United States. In Watts, the

 defendant—an eighteen-year-old Black protestor—attended a rally at the

 Washington Monument, where he participated in a discussion group about police

 brutality. 394 U.S. at 706. During this discussion, the defendant declared that

 I have already received my draft classification as 1-A and I
 have got to report for my physical this Monday coming. I
 am not going. If they ever make me carry a rifle the first
 man I want to get in my sights is [President Lyndon Baines
 Johnson].6 They are not going to make me kill my black
 brothers.

 Id. (extraneity omitted) (emphasis added). Befitting the era, one member of the

 discussion group was an investigator from the Army Counter Intelligence Corps. Id.

 The next day, the defendant was arrested by Secret Service agents. He was ultimately

 indicted and convicted under a federal statute which prohibited individuals from

 “knowingly and willfully . . . (making) any threat to take the life of or to inflict bodily

 harm upon the President of the United States[.]” Id. at 705.

 6 The defendant in Watts referred to the President as “LBJ.”
 STATE V. TAYLOR

 2021-NCSC-164

 Opinion of the Court

¶ 23 Upon his appeal, the defendant argued that his statement “was a kind of very

 crude offensive method of stating a political opposition to the President” and was thus

 shielded by the First Amendment. Id. at 707. In a per curiam opinion, the preeminent

 forum agreed with the defendant and held that the First Amendment barred his

 conviction. The Supreme Court of the United States began by affirming that “[t]he

 Nation undoubtedly has a valid, even an overwhelming, interest in protecting the

 safety of its Chief Executive and in allowing him to perform his duties without

 interference from threats of physical violence.” Id. Notwithstanding this

 “overwhelming” interest, the high Court concluded that the challenged federal

 statute could only be applied consistently with First Amendment requirements if

 prosecutors could prove that the defendant made a “true threat” against the

 President. Id. at 708. In its opinion, the Supreme Court of the United States did not

 discuss the difference between a true threat and protected political hyperbole;

 instead, the high court simply concluded that “[t]aken in context, and regarding the

 expressly conditional nature of the statement and the reaction of the listeners, we do

 not see how [the defendant’s statement] could be interpreted” as anything other than

 constitutionally protected political speech. Id.

¶ 24 The Watts decision contains three insights that are germane to our analysis in

 the instant case. First, Watts confirms that in defining and applying the true threats

 exception, a statute criminalizing speech “must be interpreted with the commands of
 STATE V. TAYLOR

 2021-NCSC-164

 Opinion of the Court

 the First Amendment clearly in mind.” Id. at 707. Second, Watts instructs us that

 even if a state’s interest in protecting its public officials is “overwhelming,” the First

 Amendment interest in protecting speakers who engage in controversial but

 constitutionally permissible speech is even more substantial. Id. In every case

 interpreting the permissible scope of a statute “which makes criminal a form of true

 speech . . . [w]hat is a threat must be distinguished from what is constitutionally

 protected speech.” Id. Third, Watts provides that in order to determine whether a

 defendant’s particular statements contain a true threat, a court must consider (1) the

 context in which the statement was made, (2) the nature of the language the

 defendant deployed, and (3) the reaction of the listeners upon hearing the statement,

 although no single factor is dispositive. Id. at 708.

 2. True threats and subjective intent

¶ 25 The Supreme Court of the United States next directly considered the true

 threats exception to the First Amendment in Virginia v. Black, 538 U.S. 343 (2003).

 In Black, the Supreme Court examined a Virginia statute criminalizing the act of

 burning a cross with “an intent to intimidate a person or group of persons.” Id. at 347.

 The case was before the high tribunal by virtue of consolidated appeals from three

 defendants who were convicted under the enacted law for burning crosses: one who

 burned a cross during a Ku Klux Klan rally and two who attempted to burn a cross

 on the lawn of their Black neighbor. Id. at 348–50. The defendants challenged their
 STATE V. TAYLOR

 2021-NCSC-164

 Opinion of the Court

 convictions under the Virginia statute on two grounds. First, they argued that the

 statute was facially unconstitutional because it selectively discriminated against one

 specific type of speech—cross burning—on the basis of its “distinctive message,” in

 violation of the First Amendment as interpreted in R.A.V.7 Id. at 351. Second, the

 defendants argued that a provision of the statute which made the act of cross burning

 prima facie evidence of a defendant’s intent to intimidate rendered the statute

 unconstitutional. Id.

¶ 26 In a fractured set of opinions, a plurality of the Supreme Court of the United

 States rejected the defendants’ facial challenge but held that the prima facie evidence

 provision was unconstitutionally overbroad. After surveying the pervasive use of

 cross burnings as a tool for enforcing racial oppression across the South, the plurality

 examined the First Amendment implications of Virginia’s statute. Id. at 357. The

 high court began with the fundamental principle that the First Amendment

 “ordinarily denies a State the power to prohibit dissemination of social, economic and

 7 In R.A.V., the Supreme Court of the United States held that the First Amendment’s

 general prohibition on content-based speech restrictions precludes a government from
 regulating speech “based on hostility—or favoritism—towards the underlying message
 expressed,” even when all of the regulated speech is contained within a broader category of
 proscribable speech. R.A.V. v. City of St. Paul, Minn., 505 U.S. 377, 386 (1992). Thus, while
 a government could prohibit certain forms of speech “because of their constitutionally
 proscribable content (obscenity, defamation, etc.),” a government could not prohibit only
 certain speech falling within one of the proscribable categories on the basis of something
 other than the feature which makes the expression proscribable in the first place. Id. at 383–
 84 (“[T]he government may proscribe libel; but it may not make the further content
 discrimination of proscribing only libel critical of the government.”).
 STATE V. TAYLOR

 2021-NCSC-164

 Opinion of the Court

 political doctrine which a vast majority of its citizens believes to be false and fraught

 with evil consequence.” Id. at 358 (extraneity omitted) (quoting Whitney v. California,

 274 U.S. 357, 374 (1927) (Brandeis, J., concurring)). The Supreme Court then

 acknowledged the existence of well-established categorical exceptions to this general

 rule, explaining that the First Amendment did not prevent the government from

 “regulat[ing] certain categories of expression” which are utterly lacking in

 constitutional value, including true threats. Id.

 “True threats” encompass those statements where the
 speaker means to communicate a serious expression of an
 intent to commit an act of unlawful violence to a particular
 individual or group of individuals. The speaker need not
 actually intend to carry out the threat. Rather, a
 prohibition on true threats protect[s] individuals from the
 fear of violence and from the disruption that fear
 engenders, in addition to protecting people from the
 possibility that the threatened violence will
 occur. Intimidation in the constitutionally proscribable
 sense of the word is a type of true threat, where a speaker
 directs a threat to a person or group of persons with the
 intent of placing the victim in fear of bodily harm or death.

 Id. at 359–60 (extraneity omitted).

¶ 27 The plurality held that the First Amendment’s general prohibition on content-

 based discrimination did not prevent Virginia from singling out for regulation one

 “particularly virulent form of intimidation,” because “[u]nlike the statute at issue in

 R.A.V., the Virginia statute does not single out for opprobrium only that speech

 directed toward . . . specified disfavored topics.” Id. at 362–63. This determination
 STATE V. TAYLOR

 2021-NCSC-164

 Opinion of the Court

 was based upon the plurality’s rationale that it was acceptable for the government to

 target one subset of a broader category of proscribable speech—cross burning—if the

 focus was motivated by characteristics which made the broader category of speech—

 true threats—proscribable in the first place. Id. at 362 (“[T]he First Amendment

 permits content discrimination based on the very reasons why the particular class of

 speech at issue is proscribable.”) (extraneity omitted). However, the plurality

 concluded that the “prima facie evidence provision . . . renders the statute

 unconstitutional” because it “permits the Commonwealth to arrest, prosecute, and

 convict a person based solely on the fact of cross burning itself.” Id. at 364–65.

¶ 28 While the scope, meaning, and influence of the Black plurality opinion is

 debatable, it appears clear that Black authorizes the government to regulate a

 narrower subset of one category of constitutionally proscribable speech without

 prohibiting all speech which falls within that category, provided that the reason for

 targeting the subset of proscribable speech is the feature which pushes the broader

 category outside of the ambit of the First Amendment. Similarly, it also appears clear

 that the State need not prove that a defendant intended to actually carry out an act

 of violence in order to obtain a conviction of the defendant for communicating a threat.

 However, it remains unclear, and hence, a matter of dispute in cases such as the

 present one, as to whether Black establishes that proof of a defendant’s subjective

 intent to threaten violence is a prerequisite to obtaining a constitutionally valid
 STATE V. TAYLOR

 2021-NCSC-164

 Opinion of the Court

 conviction under any criminal statute and in every possible circumstance.

¶ 29 Defendant here argues that Black establishes such a constitutional rule that

 the government must prove a defendant’s subjective intent as an element of the

 charged crime, while the State contends, on the other hand, that the plurality’s

 reasoning was restricted to Virginia’s unique cross-burning statute. Both parties find

 support for their respective positions in cases from other jurisdictions interpreting

 Black. Compare Bagdasarian, 652 F.3d at 1116 (“The Court held in [Black] that

 under the First Amendment . . . [i]t is [ ] not sufficient that objective observers would

 reasonably perceive [a defendant’s] speech as a threat of injury or death”) with United

 States v. White, 810 F.3d 212, 219 (4th Cir. 2016) (reading Black as not disturbing its

 longstanding conclusion that “the Constitution [does not] require[ ] the Government

 to prove that a defendant subjectively intended the recipient of the communication to

 understand it as threatening” to prove a true threat). The Justices of the Supreme

 Court of the United States themselves appear to disagree about the interpretation of

 the plurality opinion in Black. Compare Perez v. Fla., 137 S. Ct. 853, 855 (2017)

 (Sotomayor, J., concurring in the denial of certiorari) (“[Watts and Black] strongly

 suggest that it is not enough that a reasonable person might have understood the

 words as a threat—a jury must find that the speaker actually intended to convey a

 threat.”) with Elonis v. United States, 575 U.S. 723, 765 (2015) (Thomas, J.,

 dissenting) (“The Court's fractured opinion in Black . . . says little about whether an
 STATE V. TAYLOR

 2021-NCSC-164

 Opinion of the Court

 intent-to-threaten requirement is constitutionally mandated” in all cases). Both

 interpretations of Black are plausible.

¶ 30 The parties first dispute the meaning of the plurality’s statement that “ ‘[t]rue

 threats encompass those statements where the speaker means to communicate a

 serious expression of an intent to commit an act of unlawful violence to a particular

 individual or group of individuals.” Black, 538 U.S. at 359 (emphasis added).

 Defendant construes this sentence to mean that an individual communicates a true

 threat only when he or she speaks with the specific intent of threatening the listener.

 The State interprets this sentence to mean that an individual communicates a true

 threat whenever the individual intentionally communicates any statement which

 objectively contains a “serious expression of an intent” to threaten, regardless of

 whether the individual specifically intended to threaten the listener.

¶ 31 Defendant’s narrower interpretation strikes some balance between the First

 Amendment’s express safeguard of free speech and the government’s necessary

 protection of society’s members from acts of violence. In our view, the most “natural

 reading” of the language in dispute “is that the speaker intends to convey everything

 following the phrase means to communicate, rather than just to convey words that

 someone else would interpret as a ‘serious expression of an intent to commit an act of

 unlawful violence.’ ” United States v. Heineman, 767 F.3d 970, 980 (10th Cir. 2014)

 (citation omitted); see also United States v. Cassel, 408 F.3d 622, 631 (9th Cir. 2005)
 STATE V. TAYLOR

 2021-NCSC-164

 Opinion of the Court

 (“A natural reading of this language embraces not only the requirement that the

 communication itself be intentional, but also the requirement that the speaker intend

 for his language to threaten the victim.”)

¶ 32 By contrast, the State’s argument that the plurality meant only that a speaker

 “must intend to make the forbidden communication” is broader and more direct. The

 State’s approach hinges solely upon the speaker’s volition, or lack thereof, in

 conveying the message, thus negating the need for a further probe into the speaker’s

 intent to execute the described act which may or may not result in an improper

 imposition upon the speaker’s First Amendment right to free speech. “If there is no

 requirement that the defendant intend the victim to feel threatened, it would be

 bizarre to argue that the defendant must still intend to carry out the threat.”

 Heineman, 767 F.3d 970, 980–81 (10th Cir. 2014). “The clear import of this definition

 is that only intentional threats are criminally punishable consistently with the First

 Amendment.” Cassel, 408 F.3d at 631.

¶ 33 The parties next dispute the significance of the Supreme Court’s statement

 that “[i]ntimidation in the constitutionally proscribable sense of the word is a type of

 true threat, where a speaker directs a threat to a person or group of persons with the

 intent of placing the victim in fear of bodily harm or death.” Id. at 359 (emphasis

 added). Defendant asserts that this legal observation identifies the characteristic

 which transforms protected speech into a proscribable true threat: the speaker’s
 STATE V. TAYLOR

 2021-NCSC-164

 Opinion of the Court

 subjective intent to threaten. The State counters that this explanatory reference does

 nothing more than define a category of true threats—namely, intimidation—which is

 manifested when the speaker intends to threaten the listener. Under this

 interpretation, the First Amendment does not necessarily require proof of the

 speaker’s subjective intent in every case involving threats. We regard Black to hold

 that a speaker’s subjective intent to threaten is the pivotal feature separating

 constitutionally protected speech from constitutionally proscribable true threats.

 3. Applying subjective intent to the true threats exception

¶ 34 Under the First Amendment, the State may not punish an individual for

 speaking based upon the contents of the message communicated. This Court

 recognizes that there are limited exceptions to this principle, as the State is permitted

 to criminalize certain categories of expression which, by their very nature, lack

 constitutional value. However, these categories must have narrow parameters to

 ensure that the State does not target or dissuade constitutionally protected

 expression based upon the controversial nature of the speech. Statutes which

 criminalize pure speech but do not require any proof of the defendant’s intent may

 chill the utterance of protected speech by punishing morally innocent speakers and

 inducing self-censorship. Based upon these conclusions, we define a true threat as an

 objectively threatening statement communicated by a party which possesses the

 subjective intent to threaten a listener or identifiable group.
 STATE V. TAYLOR

 2021-NCSC-164

 Opinion of the Court

¶ 35 When an individual communicates a true threat, the First Amendment allows

 the State to punish the individual because a true threat is not “the type of speech

 [which is] indispensable to decision making in a democracy.” First Nat. Bank of Bos.

 v. Bellotti, 435 U.S. 765, 777 (1978). A true threat stems from the opposite form of

 speech, in that it reflects an individual’s effort to settle political disputes by violence

 rather than deliberation. Shackelford v. Shirley, 948 F.2d 935, 938 (5th Cir. 1991)

 (“[E]xpression has special value only in the context of ‘dialogue’: . . . It is not plausible

 to uphold the right to use words as projectiles where no exchange of views is

 involved.”) (quoting L. Tribe, American Constitutional Law, § 12–8 at 836–37 (2d ed.

 1988)). An individual who communicates a true threat hopes to influence public

 decision-making not through legitimate means—the painstaking work of convincing

 fellow citizens or political leaders to change their actions or views—but by “creat[ing]

 a pervasive fear in victims that they are a target of violence.” Black, 538 U.S. at 360;

 see also Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coal. of Life

 Activists, 290 F.3d 1058, 1086 (9th Cir. 2002) (explaining that when a defendant

 makes a true threat, it is “not staking out a position of debate but of threatened

 demise”).

¶ 36 The true threats exception emanates from the recognition that certain speech

 acts “do[ ] not in any sense contribute to the values the first amendment was designed

 to advance,” Shackelford, 948 F.2d at 938, because these speech acts form “no
 STATE V. TAYLOR

 2021-NCSC-164

 Opinion of the Court

 essential part of any exposition of ideas.” Chaplinsky v. New Hampshire, 315 U.S.

 568, 572 (1942). But it is inconsistent with the First Amendment to define the true

 threats category so broadly as to discourage constitutionally valued speech. There is

 existent peril when courts are challenged to distinguish between protected speech

 and proscribable speech, for our legal forums cannot permit the government to

 impinge upon the “free trade in ideas[,] even”—especially—“ideas that the

 overwhelming majority of people might find distasteful or discomforting.” Black, 538

 U.S. at 358. We thus interpret all exceptions to the First Amendment as necessary

 but narrow departures from the “bedrock principle” that “the government may not

 prohibit the expression of an idea simply because society finds the idea itself offensive

 or disagreeable.” Texas v. Johnson, 491 U.S. 397, 414 (1989).

¶ 37 The First Amendment interest in fostering speech is particularly substantial

 when, as in the present case, the speech in question is a message critiquing the

 manner in which an elected official has chosen to carry out the position’s public

 duties. See Connick v. Myers, 461 U.S. 138, 145 (1983) (“[S]peech on public issues

 occupies the highest rung of the hierarchy of First Amendment values, and is entitled

 to special protection.”) (extraneity omitted). The First Amendment’s protection of the

 right to criticize public officials safeguards our democracy by keeping elected

 representatives accountable to the people whom they serve. To ensure that this right

 can be vigorously and unreservedly exercised, the First Amendment constrains us to
 STATE V. TAYLOR

 2021-NCSC-164

 Opinion of the Court

 reject any interpretation of N.C.G.S. § 14-16.7(a) which would “chill[ ]

 constitutionally protected political speech because of the possibility that the [State]

 will prosecute—and potentially convict—somebody engaging only in lawful political

 speech at the core of what the First Amendment is designed to protect.” Black, 538

 U.S. at 365.

¶ 38 The State contends that the subjective intent requirement is “inconsistent with

 the purposes of the true-threats exception to the First Amendment.” We fully agree

 that the true threats doctrine, like all categorical exceptions to the First Amendment,

 permits the State to criminalize speech which is “of such slight social value . . . that

 any benefit that may be derived from [it] is clearly outweighed by the social interest

 in order and morality.” R.A.V., 505 U.S. at 383.

¶ 39 The State also submits that requiring prosecutors to establish a defendant’s

 subjective intent will “hinder the State’s ability to protect its citizens from unlawful

 threats of violence.” While we do not diminish the magnitude and legitimacy of the

 State’s concern, nonetheless its desire to totally eliminate the element of a

 defendant’s subjective intent must yield to the constitutional freedoms shielded by

 the First Amendment and recognized by the Supreme Court of the United States. In

 tandem with the preeminent tribunal’s precedent, our interpretation of the First

 Amendment prompts us to decline the State’s invitation to forsake a subjective intent

 requirement. As in Watts, our recognition of the State’s “overwhelming[ ] interest in
 STATE V. TAYLOR

 2021-NCSC-164

 Opinion of the Court

 protecting the safety of its [public officers] and in allowing [them] to perform [their]

 duties without interference from threats of physical violence,” Watts, 394 U.S at 707,

 is no substitute for the First Amendment’s demand that we restrain the State from

 criminalizing protected expression.

¶ 40 Finally, the State argues that applying Watts and Black in a manner which

 requires the government to prove a defendant’s subjective intent “would throw the

 true-threats exception out of step with the rest of the First Amendment,” because

 other constitutionally proscribable categories of speech do not require proof of a

 defendant’s subjective intent or state of mind. This legal deduction is not a definitive

 declaration of the status of the law in this area.8

¶ 41 Even if the State is correct in its assertion that there remain areas of First

 Amendment law where a speaker’s intent or state of mind is not central to the

 constitutional inquiry, our decision to require proof of subjective intent in the true

 threats context does not rise to a level of appellate law upheaval nor create any

 academic discord that does not already exist.

¶ 42 Based on the foregoing analysis, and consistent with our interpretation of the

 8 Although there is not a consensus, many scholars agree that the First Amendment

 generally requires at least some consideration of a defendant’s intent or state of mind when
 examining the permissible scope of civil or criminal liability for speech acts. See, e.g., Leslie
 Kendrick, Speech, Intent, and the Chilling Effect, 54 Wm. & Mary L. Rev. 1633, 1641 (2013)
 (“The Supreme Court has recognized several categories of speech that the First Amendment
 does not protect, such as defamation, incitement, threats, obscenity, child pornography,
 fraud, and fighting words. . . . Virtually all of these categories are defined by reference to the
 speaker's state of mind.”).
 STATE V. TAYLOR

 2021-NCSC-164

 Opinion of the Court

 First Amendment and cited relevant precedents, we determine that the State is

 required to prove both an objective and a subjective element in order to convict

 defendant under N.C.G.S. § 14-16.7(a).

 B. Sufficiency of the evidence

¶ 43 In determining whether the Court of Appeals erred in concluding that the State

 presented insufficient evidence to meet its burden on both the objective and subjective

 prongs, this Court must employ the elements previously discussed in order to

 determine if defendant communicated a true threat against District Attorney Welch.

 1. Independent review

¶ 44 “[I]n cases raising First Amendment issues . . . an appellate court has an

 obligation to make an independent examination of the whole record in order to make

 sure that the judgment does not constitute a forbidden intrusion on the field of free

 expression.” Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 499 (1984)

 (extraneity omitted). This obligation supplements rather than supplants the analysis

 that we typically utilize when reviewing a trial court’s decision. In the context of a

 libel suit, this Court has explained that independent whole record review is not

 “inherently inconsistent with the principle that a court, on a motion for directed

 verdict or [judgment notwithstanding the verdict], must determine whether the

 evidence, taken in the light most favorable to the non-moving party, is sufficient as a

 matter of law to be submitted to the jury.” Desmond v. News and Observer Publ’g Co.,
 STATE V. TAYLOR

 2021-NCSC-164

 Opinion of the Court

 375 N.C. 21, 44, n.16 (2020) (extraneity omitted). The same principle is applicable in

 matters in which we examine a trial court’s decision to deny a defendant’s motion to

 dismiss in a criminal case.

¶ 45 Independent whole record review does not empower an appellate court to

 ignore a trial court’s factual determinations. In this regard, an appellate court is not

 entitled to “make its own findings of fact and credibility determinations, or overrule

 those of the trier of fact.” Desmond, 375 N.C. at 44, n.16. To the extent that the Court

 of Appeals failed to “defer[ ] to the jury's findings on . . . historical facts [and]

 credibility determinations,” United States v. Hanna, 293 F.3d 1080, 1088 (9th Cir.

 2002), the State is correct regarding the basic introductory determinations that the

 Court of Appeals erred in its application of independent whole record review.

¶ 46 This error can be illustrated by considering the words at issue in this case.

 Some of the most strident language employed by defendant in his criticism of the

 elected district attorney, which defendant readily admitted that defendant posted on

 his social media page, included these statements:

 • I hope those that are friends with her [the elected
 district attorney] share my post because she will be
 the first to go, period and point made.
 • When the deputy ask me is it worth it. I would say
 with a Shotgun Pointed at him and a ar15 in the
 other arm was it worth to him? Who cares what
 happens to the person I meet at the door. I’m sure he
 won’t. I would open every gun I have. . . . Death to
 our so called judicial system . . . .
 • This is how politics works. That’s why my harsh
 STATE V. TAYLOR

 2021-NCSC-164

 Opinion of the Court

 words to her and any other that will Listen and
 share it To her [social media] page.
 • If that [vigilante justice] what it takes [ ].9 I will give
 them both [the elected district attorney and “any
 other that will Listen”]10 the [mountain] justice they
 deserve. . . . If our head prosecutor won’t do anything
 then the death to her as well. Yea I said it. Now raid
 my house for communicating threats and see what
 they meet. . . .
 • It can start at my house. Hell this has to start
 somewhere. If the courts won’t do it as have been
 proven. Then yes it Is up to the people to administer
 justice! I’m always game to do so. They make new
 ammo everyday!
 • It is time for old Time mtn justice! Yes [ ] I said it.
 Now let Them knock on my door.

¶ 47 While all of defendant’s words may be political hyperbole, and hence, protected

 speech, defendant’s social media utterances do not represent mere political hyperbole

 as a matter of law. Defendant’s statements should not be read in isolation and are

 more properly considered in context; therefore, when viewed in the light most

 favorable to the State, these statements would potentially be reasonably regarded by

 a jury as constituting a true threat to inflict serious bodily injury upon or to kill the

 elected district attorney. Defendant’s multiple uses of the word “death” in direct

 9 The word “that” was utilized by defendant in lieu of the phrase “vigilante justice” in

 response to an observer’s social media post who used the phrase “vigilante justice” in
 supporting defendant’s views.
 10 The reference to “both” made by defendant was included in the next social media

 post which followed a social media post by him regarding two different persons: “. . . her and
 any other that will Listen . . . .”
 STATE V. TAYLOR

 2021-NCSC-164

 Opinion of the Court

 reference to the elected district attorney and the judicial system in which she was

 serving, defendant’s favorable reception to the exercise of “vigilante justice” and “old

 time mountain justice” for those individuals who are a part of the court system,

 defendant’s numerous representations of his willingness to utilize firearms to

 accomplish his manifesto, defendant’s several expressions of bravado concerning his

 commitment to employ firearms against any representative of the criminal justice

 system, and defendant’s repeated expression of the hope that the elected district

 attorney would become aware of defendant’s social media posts all combine to

 warrant consideration by a jury as to whether defendant has issued a true threat to

 inflict serious bodily injury upon or to kill the elected district attorney.

¶ 48 Because the question of whether the State presented substantial evidence of

 each essential element of the offense charged so as to survive defendant’s motion to

 dismiss is a question of law, we review a trial court’s denial of a defendant’s motion

 to dismiss de novo. State v. Blagg, 377 N.C. 482, 2021-NCSC-66, ¶ 10. In contrast, in

 ruling on a defendant’s motion to dismiss, the trial court itself

 need determine only whether there is substantial evidence
 of each essential element of the crime and that the
 defendant is the perpetrator. Substantial evidence is the
 amount necessary to persuade a rational juror to accept a
 conclusion. In evaluating the sufficiency of the evidence to
 support a criminal conviction, the evidence must be
 considered in the light most favorable to the State; the
 State is entitled to every reasonable intendment and every
 reasonable inference to be drawn therefrom. In other
 words, if the record developed at trial contains substantial
 STATE V. TAYLOR

 2021-NCSC-164

 Opinion of the Court

 evidence, whether direct or circumstantial, or a
 combination, to support a finding that the offense charged
 has been committed and that the defendant committed it,
 the case is for the jury and the motion to dismiss should be
 denied.

 State v. Golder, 374 N.C. 238, 249–50 (2020) (extraneity omitted).

¶ 49 Justice Earls, our learned colleague who concurs in part and dissents in part

 with our opinion, views our determination of the correctness of the trial court’s

 decision to deny defendant’s motion to dismiss based upon the State’s presentation of

 substantial evidence of the charged offense as an exercise of speculation on our part

 which reaches a conclusion which she opines that the evidence does not support.

 However, not only have we refrained from drawing such factual conclusions from the

 evidence, but we have observed the well-established principle that “[t]he jury’s role is

 to weigh evidence, assess witness credibility, assign probative value to the evidence

 and testimony, and determine what the evidence proves or fails to prove.” State v.

 Moore, 366 N.C. 100, 108 (2012) (emphasis added). Therefore, a jury is required to

 have the opportunity to fulfill these responsibilities in the present case upon remand.

¶ 50 The bar to survive a defendant’s motion to dismiss for insufficiency of the

 evidence is low, such that “[i]t is sometimes difficult to distinguish between evidence

 sufficient to carry a case to the jury, and a mere scintilla, which only raises a suspicion

 or possibility of the fact in issue.” State v. Earnhardt, 307 N.C. 62, 66 (1982) (quoting

 State v. Johnson, 199 N.C. 429, 431 (1930)). However, “if there be any evidence
 STATE V. TAYLOR

 2021-NCSC-164

 Opinion of the Court

 tending to prove the fact in issue, or which reasonably conduces to its conclusion as a

 fairly logical and legitimate deduction, and not merely such as raises a suspicion or

 conjecture in regard to it, the case should be submitted to the jury.” Id. (emphasis

 added) (quoting Johnson, 199 N.C. at 431); see also State v. Butler, 356 N.C. 141, 145

 (2002) (“To be substantial, the evidence need not be irrefutable or uncontroverted; it

 need only be such as would satisfy a reasonable mind as being ‘adequate to support a

 conclusion.’ ” (quoting State v. Lucas, 353 N.C. 568, 581 (2001))). When considering a

 motion to dismiss for insufficiency of the evidence a trial court “should not be

 concerned with the weight of the evidence.” Earnhardt, 307 N.C. at 67.

¶ 51 This oft-cited precedent reveals the great deference which our courts, whether

 at the trial or appellate level, must give to the vital role of the citizens of our state’s

 local communities who are selected to serve as jurors.11 “Once the [trial] court decides

 that a reasonable inference of defendant's guilt may be drawn from the

 circumstances, then it is for the jury to decide whether the facts, taken singly or in

 combination, satisfy it beyond a reasonable doubt that the defendant is actually

 guilty.” State v. Fritsch, 351 N.C. 373, 379 (2000) (emphasis added) (extraneity

 omitted). For this reason, “[i]n borderline or close cases, our courts have consistently

 11 A role of the jury is “to act as the voice and conscience of the community . . . [and]

 to temper the harshness of the law with the ‘commonsense judgment of the community.’ ”
 State v. Scott, 314 N.C. 309, 311–12 (1985) (quoting Taylor v. Louisiana, 419 U.S. 522, 530
 (1975)).
 STATE V. TAYLOR

 2021-NCSC-164

 Opinion of the Court

 expressed a preference for submitting issues to the jury.” State v. Yisrael,

 255 N.C. App. 184 (2017), aff’d per curiam, 371 N.C. 108 (2018); see also State v.

 Blagg, 377 N.C. 482, 2021-NCSC-66, ¶ 12.

¶ 52 In applying the cited case law to the present case, it is clear that the duty of

 the trial court was to determine whether there was substantial evidence of the

 criminal offense of a threat against a court officer and substantial evidence that

 defendant was the perpetrator of the offense, as the trial court considered the

 evidence in the light most favorable to the State in order to ascertain if defendant’s

 motion to dismiss should be allowed or denied. Since there was no dispute that

 defendant created the social media posts at issue, and since these messages of

 defendant constitute substantial evidence of a threat against the elected district

 attorney when this evidence is viewed in the context of the State’s entitlement to

 every reasonable intendment and inference to be taken from it, we therefore

 determine that our legal precedent has firmly established that defendant’s motion to

 dismiss was correctly denied and that the case should have been considered by the

 jury. Once this modest standard of evidence was satisfied by the State, then a jury

 composed of defendant’s neighboring citizens should have had the opportunity to

 determine if defendant had made a true threat to the local district attorney.

¶ 53 In acknowledging the State’s concession that defendant’s conviction must be

 vacated because of the trial court’s error in failing to properly instruct the jury
 STATE V. TAYLOR

 2021-NCSC-164

 Opinion of the Court

 concerning the operation of the First Amendment, the sole issue for this Court to

 determine is whether to remand the matter to the trial court for, after vacating the

 trial court’s judgment rendered pursuant to the conviction, entry of a judgment of

 acquittal or a new trial. Because, as we have discussed above, the facts presented by

 the State could have allowed a reasonable jury to conclude defendant uttered a true

 threat, a properly instructed jury must be allowed to consider this question.

¶ 54 Accordingly, while we agree with the Court of Appeals’ decision to vacate

 defendant’s conviction, there remain factual questions for a properly instructed jury

 to determine. Therefore, we reverse the Court of Appeals opinion that remands this

 case to the trial court for entry of a judgment of acquittal, and instead we remand the

 case to the trial court for a new trial in order to permit a jury composed of defendant’s

 peers to determine whether defendant committed the criminal offense of making a

 threat to inflict serious bodily injury upon or to kill a court officer because of the

 exercise of that officer’s duties, in violation of N.C.G.S. § 14-16.7.

 REVERSED AND REMANDED.
 Justice EARLS concurring in part, dissenting in part.

¶ 55 I concur in the portion of the majority opinion holding that, to convict a

 defendant under N.C.G.S. § 14-16.7(a), the First Amendment requires the State to

 prove both that the defendant has communicated a message that a reasonable

 observer would understand to contain a threat of violence and that the defendant

 communicated the message with the subjective intent to threaten an individual or

 identifiable group. I write separately on this issue to offer two additional

 observations. First, the common law principles articulated in Elonis v. United States,

 575 U.S. 723 (2015) bolster the majority’s conclusion that a true threat requires proof

 of the speaker’s subjective intent to threaten. Second, it is important to recognize the

 tension inherent in the true threats doctrine in light of the First Amendment’s

 broader purpose of fostering the conditions for democratic self-governance.

¶ 56 However, I respectfully dissent from the majority’s conclusion that the State’s

 evidence in this case was sufficient to withstand Taylor’s motion to dismiss. An

 objectively reasonable observer viewing Taylor’s Facebook posts in their full context

 could not understand his messages to contain a serious intention to inflict bodily

 harm on District Attorney Welch. Further, even if the State had satisfied the objective

 element, there is insufficient evidence to support the conclusion that Taylor

 subjectively intended to threaten District Attorney Welch with violence. The

 majority’s decision to hold otherwise reflects a misapplication of the independent
 STATE V. TAYLOR

 2021-NCSC-164

 Earls, J., concurring in part, dissenting in part

 review standard which is inconsistent with the assiduous protection of free

 expression the First Amendment demands.

 I. Common law principles support the conclusion that attaching criminal
 liability to purportedly threatening speech requires consideration of
 the speaker’s subjective intent.

¶ 57 In Elonis v. United States, 575 U.S. 723 (2015), the United States Supreme

 Court considered a defendant’s challenge to his conviction under a federal statute

 criminalizing the act of communicating threats across state lines. In his argument to

 this Court, Taylor invoked Elonis for the proposition that to comport with the First

 Amendment, criminal statutes targeting pure speech must be construed to

 incorporate a heightened mens rea requirement. The State argued that because

 Elonis was decided solely on statutory interpretation grounds, the decision was

 entirely irrelevant. However, the common law principles Elonis was based on are

 especially salient in the First Amendment context and support the conclusion that

 statutes proscribing pure speech must be interpreted to incorporate a heightened

 mens rea requirement.

¶ 58 The defendant in Elonis posted “self-styled ‘rap’ lyrics,” poems, and

 photographs with “graphically violent language and imagery” on Facebook. Id. at

 726–27. Some of the language and imagery was directed at the defendant’s employer.

 Id. Other posts contained “crude, degrading, and violent material about [the

 defendant’s] soon-to-be ex-wife,” including a post asking if the protective order his
 STATE V. TAYLOR

 2021-NCSC-164

 Earls, J., concurring in part, dissenting in part

 wife had obtained was “thick enough to stop a bullet.” Id. at 727–30. In the same post,

 the defendant claimed he possessed “enough explosives to take care of the State Police

 and the Sheriff’s Department.” Id. Another post read, “[e]nough elementary schools

 in a ten mile radius to initiate the most heinous school shooting ever imagined And

 hell hath no fury like a crazy man in a Kindergarten class The only question is . . .

 which one?” Id. at 729. The defendant invoked his “freedom of speech” under the First

 Amendment and asserted his messages were protected as artistic expression. Id.

¶ 59 Despite his disclaimers, the defendant in Elonis was indicted for “making

 threats to injure patrons and employees of the park, his estranged wife, police officers,

 a kindergarten class, and an FBI agent, all in violation of 18 U.S.C. § 875(c).” Id. at

 731. As written, this federal statute applied to anyone who “transmit[ted] in

 interstate or foreign commerce any communication containing . . . any threat to injure

 the person of another.” Id. at 732. At trial, the defendant requested a jury instruction

 stating that in order to convict him under 18 U.S.C. § 875(c), “the government must

 prove that he intended to communicate a true threat.” Id. at 731. The government

 countered that “it was irrelevant whether [the defendant] intended the postings to be

 threats.” Id. at 732. The trial court agreed with the government, the instruction was

 not given, and the defendant was convicted. Id. The Third Circuit affirmed,

 concluding that “the intent required by [18 U.S.C. § 875(c)] is only the intent to

 communicate words that the defendant understands, and that a reasonable person
 STATE V. TAYLOR

 2021-NCSC-164

 Earls, J., concurring in part, dissenting in part

 would view as a threat.” Id. at 732.

¶ 60 In an opinion authored by Chief Justice Roberts, the United States Supreme

 Court reversed. According to the majority, although 18 U.S.C. § 875(c) “does not

 indicate whether the defendant must intend that his communication contain a

 threat,” Congress’s failure to “specify any required mental state . . . does not mean

 that none exists.” Id. at 734. Instead, the majority invoked the longstanding “rule of

 construction” that criminal statutes should be interpreted to “include broadly

 applicable scienter requirements, even where the statute by its terms does not

 contain them.” Id. (citing United States v. X–Citement Video, Inc., 513 U.S. 64, 70

 (1994)). In the majority’s view, under 18 U.S.C. § 875(c), “the crucial element

 separating legal innocence from wrongful conduct is the threatening nature of the

 communication.” Id. at 737 (cleaned up). Applying its own rule of statutory

 construction, the majority read 18 U.S.C. § 875(c) as incorporating a requirement that

 the defendant be at least reckless with regards to the possibility that the “contents

 of” the communicated message contained a threat.1 Id. at 740.

¶ 61 In justifying the statutory presumption it was invoking, the Elonis majority

 explained “that a defendant generally must know the facts that make his conduct fit

 1 The majority vacated the defendant’s conviction and remanded the case without

 deciding whether that scienter requirement could be satisfied by a showing of recklessness
 alone, or if the government was required to prove a defendant possessed actual knowledge
 that the message he or she communicated contained a threat. Elonis, 575 U.S. at 742.
 STATE V. TAYLOR

 2021-NCSC-164

 Earls, J., concurring in part, dissenting in part

 the definition of the offense, even if he does not know that those facts give rise to a

 crime.” Id. at 735 (cleaned up). That is, a defendant must know he is engaging in the

 type of conduct that is criminalized (in the defendant’s case, communicating a threat),

 even if he or she does not know that the conduct gives rise to criminal liability. See

 X-Citement Video, Inc., 513 U.S. at 72, n.3 (“Criminal intent serves to separate those

 who understand the wrongful nature of their act from those who do not, but [intent]

 does not require knowledge of the precise consequences that may flow from that act

 once aware that the act is wrongful.”). This logic reflects a “basic principle underlying

 the common law, namely, the importance of showing what Blackstone called ‘a vicious

 will.’ ” Rehaif v. United States, 139 S.Ct. 2191, 2196 (2019) (quoting 4 W. Blackstone,

 Commentaries on the Laws of England 21 (1769)). Accordingly, most criminal

 offenses incorporate a scienter requirement to distinguish between the “morally

 culpable” defendant who chooses to engage in wrongful conduct and the defendant

 whose “otherwise innocent conduct” happens to be criminal. Elonis, 575 U.S. at 745

 (Alito, J., concurring in part, dissenting in part); see also Rehaif, 139 S. Ct. at 2196

 (“The cases in which we have emphasized scienter’s importance in separating

 wrongful from innocent acts are legion.”).

¶ 62 The need to distinguish between culpable and innocent conduct is heightened

 when a statute criminalizes pure speech. Pure speech cannot ordinarily be made

 criminal based solely upon the message the speaker conveys. That is a core First
 STATE V. TAYLOR

 2021-NCSC-164

 Earls, J., concurring in part, dissenting in part

 Amendment premise. To the extent there are recognized exceptions to this baseline

 rule, it is never the act of speaking alone that statutes like N.C.G.S. § 14-16.7(a)

 criminalize. It is the act of speaking a particular kind of message which, by its very

 nature, removes the speech from the First Amendment’s ambit. The State is allowed

 to convert an act which is ordinarily non-criminal—an act which individuals

 ordinarily possess a hallowed constitutional right to engage in—into criminal conduct

 solely because of the substance of the message communicated. An intent requirement

 helps ensure that only those individuals who are morally culpable are criminally

 punished.

¶ 63 At the same time, when a criminal statute implicates the First Amendment,

 the presumption in favor of a heightened mens rea requirement also helps ensure

 that the First Amendment protections enjoyed by all individuals remain vibrant. In

 his partial concurrence, Justice Alito acknowledged this interaction between criminal

 scienter requirements and First Amendment protections, noting the argument that

 defining a threats statute in a manner “not limited to threats made with the intent

 to harm[ ] will chill statements that do not qualify as true threats, e.g., statements

 that may be literally threatening but are plainly not meant to be taken seriously.”

 Elonis, 575 U.S. at 748 (Alito, J., concurring in part, dissenting in part). In Justice

 Alito’s view, “[r]equiring proof of recklessness” would strike a sufficient balance

 between providing “adequate breathing space” for the exercise of First Amendment
 STATE V. TAYLOR

 2021-NCSC-164

 Earls, J., concurring in part, dissenting in part

 rights and preventing the conversion of “hurtful, valueless threats into protected

 speech.” Id. The concerns Justice Alito identified have both common law and First

 Amendment dimensions. There is a risk that individuals will lack notice that certain

 speech acts could subject them to criminal punishment, and a risk that individuals

 will engage in self-censorship to avoid treading past the inchoate boundaries of an

 expansive criminal statute targeting speech. An intent requirement helps ensure that

 all individuals can detect the boundary between protected and proscribable speech.

¶ 64 The principles at issue in Elonis, though couched in the common law, have

 purchase in the First Amendment context. In my view, these principles strongly

 imply that it would be impermissible to punish Taylor if he did not act with at least

 reckless disregard towards the possibility that he was communicating a threat of

 violence to District Attorney Welch. Without some scienter requirement, Taylor could

 be convicted even if he were unaware he had engaged in the type of conduct N.C.G.S.

 § 14-16.7(a) criminalizes. Such a conviction would offend both common law and First

 Amendment principles. Accordingly, I believe Elonis lends further support and

 important context to the majority’s conclusion that true threats require proof of the

 speaker’s subjective intent.

 II. A true threat is speech without constitutional value, but the
 proliferation of true threats has constitutional salience.

¶ 65 The relevant precedents and First Amendment principles require the State to

 prove Taylor’s subjective intent to threaten. Nevertheless, the scope of the true
 STATE V. TAYLOR

 2021-NCSC-164

 Earls, J., concurring in part, dissenting in part

 threats doctrine must not be too narrow because true threats can practically

 undermine the values of freedom of speech and civic engagement that the First

 Amendment serves.

¶ 66 One of the principal justifications for permitting the State to punish true

 threats is its interest in “protecting individuals from the fear of violence, from the

 disruption that fear engenders, and from the possibility that the threatened violence

 will occur.” R.A.V. v. City of St. Paul, 505 U.S. 377, 388 (1992). As R.A.V. indicates,

 true threats may be regulated at least in part because of the reaction they engender

 in the individual recipients of these threats and in the broader community. The

 State’s interest in preventing that fear is not just a practical matter of public safety.

 The reaction of recipients and the broader community to true threats is of significant

 concern because the proliferation of true threats undermines that which the First

 Amendment aspires to “grow[ ] and preserv[e],” our system of “democratic self-

 governance.” McDonald v. Smith, 472 U.S. 479, 489 (1985) (Brennan J., concurring).

¶ 67 If the cost of participating in public life is to be bombarded with serious threats

 of violence towards one’s self and family, many people will choose to forego

 contributing their voices to the “free exchange [that] facilitates an informed public

 opinion, which, when transmitted to lawmakers, helps produce laws that reflect the

 People’s will.” Mahanoy Area Sch. Dist. v. B. L. by & through Levy, 141 S. Ct. 2038,

 2046 (2021); see also Planned Parenthood of Columbia/Willamette, Inc., 290 F.3d at
 STATE V. TAYLOR

 2021-NCSC-164

 Earls, J., concurring in part, dissenting in part

 1086 (concluding that it “turns the First Amendment on its head” to protect threats

 of violence because after being subjected to such a threat, victims “can no longer

 participate in the debate” about a controversial issue). This degrades the

 “marketplace of ideas” upon which “[o]ur representative democracy” depends. Id. As

 a result, the public will be left without the benefit of “information [which] is a

 precondition for public debate, which, in turn, is a precondition for democratic self-

 governance.” Hum. Life of Washington Inc. v. Brumsickle, 624 F.3d 990, 1022 (9th

 Cir. 2010).

¶ 68 But true threats do more than dissuade others from contributing to the

 “marketplace of ideas.” True threats interfere with the exercise of all the “cognate

 rights” and “indispensable democratic freedoms secured by the First Amendment.”

 Thomas v. Collins, 323 U.S. 516, 530 (1945). When true threats proliferate, the

 attendant fear of imminent violence deters individuals from participating in the

 institutions, processes, and everyday interactions through which Americans

 endeavor to shape the course of collective life. Faced with the threat of retributory

 violence, individuals may choose to forego exercising their rights to associate with

 like-minded citizens, to publicly assemble in protest or support of existing policies, to

 petition their government and public officials, or to publish their views for widespread

 distribution. Because it is the exercise of these rights which “protect and nurture the

 sort of active citizenship and collective action that have been the lifeblood of our
 STATE V. TAYLOR

 2021-NCSC-164

 Earls, J., concurring in part, dissenting in part

 system of government since its founding,” Ashutosh Bhagwat, The Democratic First

 Amendment, 1098 Nw. U. L. Rev. 1097, 1123 (2016), the proliferation of true threats

 is a danger to the vitality of our democracy.

¶ 69 True threats represent a particular First Amendment problem because of the

 ways the specter of violence warps the processes from which our government derives

 its legitimacy. Our nation’s and our state’s own history reveal how threats of violence

 and actual violence have kept people from exercising democratic rights they formally

 enjoyed. See, e.g., David Zucchino, Wilmington's Lie: The Murderous Coup of 1898

 and the Rise of White Supremacy, Atlantic Monthly Press (2020). If our First

 Amendment doctrines foster the proliferation of threats which make the reasonable

 fear of imminent violence a pervasive feature of political life, the First Amendment

 loses its point. R.A.V. also highlighted the concern that allowing threats of violence

 to go unpunished would contribute to real-world violence. A First Amendment which

 fosters political violence is self-defeating, because a society which settles political

 disputes by resorting to violence—or a society which is forced to settle political

 disputes in the looming shadow of violence—cannot function as a self-governing

 democracy.

¶ 70 These realities highlight the risk that an overly narrow definition of what

 constitutes a true threat will lend a cloak of legitimacy to methods of achieving

 political change that are antithetical to everything the First Amendment stands for.
 STATE V. TAYLOR

 2021-NCSC-164

 Earls, J., concurring in part, dissenting in part

 At the same time, we must consider the First Amendment’s paramount interest in

 fostering the free exchange of ideas, and the immense value to our system of

 governance that this free exchange provides. Cf. United States v. Caldwell, 408 U.S.

 665, 720–21, (1972) (“[T]he wideopen and robust dissemination of ideas and

 counterthought . . . is essential to the success of intelligent self-government.”)

 (Douglas, J., dissenting). This interest may seem remote when the speech at issue

 appears to most who encounter it to be crude, caustic, or fantastical, but our system

 functions best when citizens are “active, collective, disrespectful, and even sometimes

 incendiary.” Bhagwat at 1123; see also John Doe No. 1 v. Reed, 561 U.S. 186, 228

 (2010) (“[H]arsh criticism, short of unlawful action, is a price our people have

 traditionally been willing to pay for self-governance.”) (Scalia, J., concurring).

¶ 71 Ultimately, this case is not about the State’s authority to punish individuals

 who make true threats. That authority is uncontroverted. Instead, this case is about

 distinguishing protected from proscribable speech. While I recognize that the

 purposes the First Amendment serves require vigorous enforcement of statutes like

 N.C.G.S. § 14-16.7(a), the majority has appropriately defined the scope of the true

 threats doctrine. To prove a true threat, the State must prove both that the statement

 in question contained an objective threat of violence and that the defendant intended
 STATE V. TAYLOR

 2021-NCSC-164

 Earls, J., concurring in part, dissenting in part

 to communicate a threatening message.2 Thus, I concur fully in Part II of the majority

 opinion.

 III. The State presented insufficient evidence to support the conclusion
 that Mr. Taylor communicated a true threat.

¶ 72 Although the majority correctly defines what constitutes a true threat, the

 majority falters when tasked with applying its definition to the facts of this case.

 Despite reciting the proper standard of review, the majority does not actually conduct

 the requisite independent review of Taylor’s conviction.

¶ 73 As the United States Supreme Court has explained, when a defendant’s

 conviction potentially violates the First Amendment, “an appellate court has an

 obligation to make an independent examination of the whole record in order to make

 sure that the judgment does not constitute a forbidden intrusion on the field of free

 expression.” Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 499 (1984).

 2 Practically speaking, it is worth noting that in many cases, it is unlikely that a

 defendant who has conveyed a clear and unambiguous threat will be able to successfully
 argue they did not intend to do so. See Pope v. Illinois, 481 U.S. 497, 503 (1987) (“In many
 cases, the predicate facts conclusively establish intent, so that no rational jury could find that
 the defendant committed the relevant criminal act but did not intend to cause injury.”). In
 this context, when a communication is so “unequivocal, unconditional, immediate and specific
 as to the person threatened, as to convey a gravity of purpose and imminent prospect of
 execution,” then a defendant who understands the meaning of the words deployed will have
 a difficult time disputing the reasonable inference that he or she intended to place the listener
 in fear of imminent bodily harm. United States v. Kelner, 534 F.2d 1020, 1027 (2d Cir. 1976);
 see also United States v. Maxton, 940 F.2d 103, 106 (4th Cir. 1991) (“[M]ost of the time [a
 defendant’s] intent [to threaten] can be gleaned from the very nature of the words used in
 the communication; extrinsic evidence to prove an intent to threaten should only be necessary
 when the threatening nature of the communication is ambiguous.”).
 STATE V. TAYLOR

 2021-NCSC-164

 Earls, J., concurring in part, dissenting in part

 The majority is correct that independent review “supplements rather than supplants”

 the trial court’s role as a factfinder, in that we defer to the jury’s findings on historical

 facts and its credibility determinations. In general, when reviewing pure questions of

 fact, we take the evidence in the light most favorable to the party opposing the motion

 to dismiss on all factual issues. State v. Mason, 336 N.C. 595, 597, 444 S.E.2d 169,

 169 (1994) (“In determining whether evidence is sufficient to survive a motion to

 dismiss, the evidence is considered in the light most favorable to the State. If there is

 a conflict in the evidence, the resolution of the conflict is for the jury.”). As we

 indicated in Desmond, the same should hold true when an appellate court applies

 independent review. Desmond v. News & Observer Publ’g Co., 375 N.C. 21, 45, n.17,

 reh’g denied, 376 N.C. 535 (2020). (“We emphasize that our discussion of the evidence

 in this case is a reflection of the record as viewed in the light most favorable to

 plaintiff and summarizes what the jury could permissibly have found as fact.”); Cf.

 Veilleux v. Nat’l Broad. Co., 206 F.3d 92, 107 (1st Cir. 2000) (explaining that when

 conducting independent review in a case implicating the First Amendment, “[p]urely

 factual determinations, particularly those involving the credibility of witnesses,

 remain best addressed by the factfinder, and are subject to the usual, more

 deferential standard of review.”).

¶ 74 But the questions of whether Taylor’s statements contained an objective threat

 of violence and whether he possessed an intent to threaten are mixed questions of
 STATE V. TAYLOR

 2021-NCSC-164

 Earls, J., concurring in part, dissenting in part

 constitutional law and fact. Cf. Butt v. State, 2017 UT 33, ¶ 29 (“The First

 Amendment defense at issue involves a mixed determination of law and fact.”). On

 questions of constitutional law, our review is “plenary.” Veilleux, 206 F.3d at 106. The

 majority collapses this distinction. The appellate court must take the evidence in the

 light most favorable to the State only with respect to disputed factual issues. For

 example, the parties dispute whether District Attorney Welch’s actions after being

 notified of Taylor’s posts evinced serious fear that reflected her contemporaneous

 belief that Taylor would try to harm her. On this issue, where there is evidence in the

 record supporting the State’s position including District Attorney Welch’s testimony,

 we must presume that she did in fact fear for her personal safety and consider that

 fact to the extent it is illustrative in the First Amendment analysis. Similarly, the

 parties dispute whether Taylor wanted District Attorney Welch to see his Facebook

 posts. Again, because there is evidence in the record supporting the State’s assertion

 that Taylor did want District Attorney Welch to become aware of his statement, we

 must adopt that fact at this stage of the proceedings.

¶ 75 However, this Court has a “constitutional responsibility” to decide the ultimate

 question of whether the First Amendment permits Taylor to be convicted for violating

 N.C.G.S. § 14-16.7(a) on these facts. Bose Corp., 466 U.S. at 501. (“[T]he rule of

 independent review assigns to judges a constitutional responsibility that cannot be

 delegated to the trier of fact, whether the factfinding function be performed in the
 STATE V. TAYLOR

 2021-NCSC-164

 Earls, J., concurring in part, dissenting in part

 particular case by a jury or by a trial judge.”). Even if the defendant has been found

 guilty of violating a statute criminalizing potentially protected First Amendment

 activities, “our obligation is to make an independent examination of the whole record,

 so as to assure ourselves that th[is] judgment does not constitute a forbidden

 intrusion on the field of free expression.” Hurley v. Irish-Am. Gay, Lesbian & Bisexual

 Grp. Of Bos., 515 U.S. 557, 567–68 (1995) (cleaned up); see also Veilleux, 206 F.3d at

 106 (“Deference to the jury is muted, however, when free speech is implicated . . . .

 Appellate courts—especially but not only the Supreme Court—have been assigned

 this obligation in order to safeguard precious First Amendment liberties.”). Our task

 is not, as the majority frames it, to decide if Taylor’s “statements would potentially

 be reasonably regarded by a jury as constituting a true threat.” Our task is to decide

 if, taking the evidence on disputed factual issues in the light most favorable to the

 State, the jury could permissibly conclude that Taylor’s Facebook posts contained a

 true threat consistent with applicable First Amendment principles. See Desmond, 375

 N.C. at 44, n.16 (explaining that the goal of independent review in a libel case is “to

 ascertain whether the record can permissibly and constitutionally support a finding

 of actual malice”). By treating Taylor’s appeal as no different than any criminal

 defendant’s appeal from a trial court’s motion to dismiss, the majority eschews an

 obligation we are not entitled to ignore.

¶ 76 If, as the majority claims, “[t]he bar to survive a defendant’s motion to dismiss
 STATE V. TAYLOR

 2021-NCSC-164

 Earls, J., concurring in part, dissenting in part

 for insufficiency of the evidence is low,” then there is very little to prevent the State

 from charging any individual who makes controversial or distasteful statements

 under N.C.G.S. § 14-16.7(a) and bringing the case to trial.3 True, the defendant may

 ultimately prevail and be found not guilty. But the prospect of facing a lengthy,

 expensive trial is itself a deterrent to the free exercise of First Amendment rights.

 Cf. Farah v. Esquire Mag., 736 F.3d 528, 534 (D.C. Cir. 2013) (“[S]ummary

 proceedings are essential in the First Amendment area because if a suit entails long

 and expensive litigation, then the protective purpose of the First Amendment is

 thwarted even if the defendant ultimately prevails.”) (cleaned up). Taylor has been

 defending himself in this case for over five years and faces the prospect of still more

 litigation should the State choose to try him again. The practical effect of the

 majority’s failure to properly construe and apply the independent review standard

 will be precisely the outcome the majority claims the First Amendment compels us to

 avoid, the chilling of constitutionally protected speech.

¶ 77 Properly applying independent review, the State has failed to present

 substantial evidence to sustain Taylor’s conviction on either the objective or

 3 In fact, on appellate review of a trial court’s denial of a defendant’s motion to dismiss,

 “the reviewing court must determine whether there is substantial evidence of each essential
 element of the offense and substantial evidence that the defendant was the perpetrator of the
 offense.” State v. Smith, 307 N.C. 516, 518 (1983). The majority’s formulation that the “bar
 . . . is low” appears to conflate the probable cause necessary to sustain an indictment with
 the substantial evidence necessary to survive a motion to dismiss. Logically, these two
 standards cannot be the same—if they were, there would be no point in allowing a defendant
 to file a motion to dismiss for insufficient evidence.
 STATE V. TAYLOR

 2021-NCSC-164

 Earls, J., concurring in part, dissenting in part

 subjective elements of the true threats doctrine.

 1. The objective element

¶ 78 Although the majority claims it is assessing Taylor’s statements in their full

 context, the majority instead isolates snippets of “strident language” which it

 concludes “do not represent mere political hyperbole as a matter of law.” The problem

 with the majority’s approach is that it fails to account for how the context surrounding

 Taylor’s statements would have informed how a reasonable observer could have

 interpreted the language he chose to deploy. A reasonable observer who viewed

 Taylor’s Facebook posts in their full context could not understand his statements to

 contain an objective threat of violence.

¶ 79 Even the statements Taylor made which most plausibly read to suggest the

 possibility of actual violence—that District Attorney Welch “will be the first to go”

 and that “[i]f [she] won’t do anything, then the death to her as well”—are not direct

 threats of harm. Both statements are conditional. Whatever Taylor is implying he

 will do is predicated on the occurrence of some antecedent event (a “rebellion against

 our government,” District Attorney Welch refusing to “do anything” to prosecute

 alleged criminals in Macon County), events which a reasonable person would not
 STATE V. TAYLOR

 2021-NCSC-164

 Earls, J., concurring in part, dissenting in part

 believe to be imminent or inevitable, at least at the time Taylor posted his messages.4

 Given the context, no reasonably listener could infer that his hypothetical and

 conditional statements were literal pronouncements of his intent to physically harm

 District Attorney Welch.

¶ 80 Although Taylor did use language suggesting he might try to remedy perceived

 injustices through something other than political advocacy, none of these statements

 suggested he was planning to personally target District Attorney Welch with violent

 acts. Taylor’s statements referencing violence included his promise to “open every

 gun I have” should law enforcement raid his home; his declaration that he is “always

 game” to “administer justice” because “[t]hey make new ammo everyday!”; his

 response “If that what it takes” when his Facebook friend called for “vigilante justice”;

 and his announcement that it was “time for old [t]ime m[ountain] justice,” which

 Taylor would deliver “[r]egardless of what the law or courts say” because he was “tired

 of this political bullshit.” None of these statements contain words threatening District

 Attorney Welch specifically with actual violence. Further, a message advocating for

 4 In assessing what meaning a reasonable person could glean from Taylor’s
 statements, a court must assess the statements from the perspective of a reasonable person
 who heard the statements at the time they were made, not a reasonable person who
 encountered his statements today. In 2016, a reasonable person would likely have found the
 prospect of a violent “rebellion against our government” far more remote than a reasonable
 person would today, with knowledge of the events at the United States Capital on 6 January
 2021. Cf. State v. Taylor, 270 N.C. App. 514, 570 (2020) (“Further, if D.A. Welch ‘will be the
 first to go,’ it would only occur during a ‘rebellion against our government[.]’ The alleged
 ‘threat’ is contingent upon an event that no reasonable person would believe was ever likely
 to occur.”).
 STATE V. TAYLOR

 2021-NCSC-164

 Earls, J., concurring in part, dissenting in part

 the use of violence to achieve political change is not the same as a message conveying

 a serious expression of an intent to harm a specific person. Protected political speech

 is not “remove[d] . . . from the protection of the First Amendment” merely because it

 contains “advocacy of the use of force or violence.” N.A.A.C.P. v. Claiborne Hardware

 Co., 458 U.S. 886, 927 (1982). There is nothing in the posts connecting Taylor’s

 apparent willingness to resort to violence to his comments about what would happen

 to District Attorney Welch in the future if certain events were to occur. Taylor’s

 messages reveal nothing more than the depth of his feeling regarding what he saw as

 a grave injustice in Macon County.

¶ 81 Importantly, Taylor communicated his threats in the midst of a heated

 discussion centered on political matters of significant concern to Taylor and his

 Facebook friends. The fact that a statement was communicated in the middle of a

 conversation regarding political issues is relevant when assessing what inferences an

 observer could reasonably draw from language that is only ambiguously violent. That

 Taylor “spoke his threatening words in the context of his political views” while a

 perceived political crisis “was just unfolding” is relevant information a reasonable

 listener would necessarily consider in ascertaining the meaning of Taylor’s remarks.

 United States v. Olson, 629 F. Supp. 889, 894 (W.D. Mich. 1986). As is the fact that

 Taylor removed the messages from his Facebook page shortly after posting them. The

 majority errs in failing to account for this context.
 STATE V. TAYLOR

 2021-NCSC-164

 Earls, J., concurring in part, dissenting in part

¶ 82 Notably absent from Taylor’s diatribe is any language supporting the

 reasonable belief that he intended “to do anything specific to anyone at any particular

 time.” Taylor, 270 N.C. App. at 569. As the Supreme Court of Colorado has explained,

 the true threats inquiry “should include whether the threat contains accurate details

 tending to heighten its credibility.” Colorado ex rel. R.D., 2020 CO 44, ¶ 53. Here,

 Taylor did not specify a “date, time, and place” or method for where and how he

 intended to carry out his purported threat. Cf. United States v. Callahan, 702 F.2d

 964, 966 (11th Cir. 1983). The majority points to nothing which would lead a

 reasonable listener to conclude that Taylor had considered acting on these supposed

 threats.5 Cf. United States v. Ivers, 967 F.3d 709, 717 (8th Cir. 2020) (finding

 sufficient evidence to support a threats conviction where defendant stated “[y]ou don't

 know the 50 different ways I planned to kill [the victim]”).

¶ 83 Other courts have accorded significant weight to the presence or absence of

 such details in examining whether a defendant’s statements could reasonably be

 construed as an objective threat. For example, the Supreme Court of Washington

 concluded that there “was ample evidence from which a reasonable jury could

 determine that [a defendant’s] threats were ‘true threats,’ ” State v. Schaler, 169

 5 To be clear, the State need not prove Taylor intended to carry out the threatened

 act in order to prove he communicated a true threat. I raise this point only to demonstrate
 why a reasonable observer could not understand these statements as containing threats of
 imminent violence.
 STATE V. TAYLOR

 2021-NCSC-164

 Earls, J., concurring in part, dissenting in part

 Wash. 2d 274, 291 (2010), based in part on the fact that defendant “specifically said

 that ‘he wanted to kill them with his bare hands, by strangulation,’ ” “repeated his

 desire to kill his neighbors” on multiple occasions, and had previously threatened his

 neighbors with a chain saw, id. at 280.

¶ 84 By contrast, the Supreme Judicial Court of Massachusetts held that the

 evidence was insufficient to convict a defendant who posted a photograph of himself

 holding a gun with the caption “[m]ake no mistake of my will to succeed in bringing

 you two idiots to justice,” because “nothing else about that image suggests a clear

 intent to commit violence.” Massachusetts v. Walters, 472 Mass. 680, 695 (2015).

 Here, although Taylor’s posts may have “come across as vaguely ominous or

 disturbing,” id., they do not give rise to the reasonable inference that Taylor intended

 to physically harm District Attorney Welch. Additionally, Taylor and District

 Attorney Welch previously maintained a cordial relationship, and there was no

 evidence indicating Taylor had a propensity for engaging in violent conduct. Cf. In re

 S.W., 45 A.3d 151, 160 (D.C. 2012) (concluding that even “facially threatening words”

 could not be “reasonably and objectively perceived as communicating a threat” when

 “placed in the context of [the defendant and the purported victim’s] acknowledged

 and unaltered friendship . . . and [the defendant’s] manner of delivery”). Again, all

 this context which the majority ignores is relevant in assessing the meaning a

 reasonable person could draw from Taylor’s posts.
 STATE V. TAYLOR

 2021-NCSC-164

 Earls, J., concurring in part, dissenting in part

¶ 85 The reaction of the individuals who interacted with Taylor’s posts while his

 diatribe was unfolding is particularly telling. For example in Watts, the Supreme

 Court thought it notable that “[the defendant] and the crowd laughed after the

 [purported threat] was made.” Watts, 394 U.S. 705, 707 (1969). This emphasis on the

 reactions of those actively participating in the broader exchange within which the

 purported threats were communicated reflects the commonsense intuition that the

 actual and intended recipients of a message are in the best position to discern its

 meaning. See, e.g., D.M. ex rel. D.J.M. v. Hannibal Pub. Sch. Dist. No. 60, 647 F.3d

 754, 764 (8th Cir. 2011) (“The reaction of those who read [the speaker’s] messages is

 evidence that his statements were understood as true threats. [The recipient]

 contacted . . . a trusted adult, to discuss what in her words was ‘something serious.’ ”).

 As the Court of Appeals explained,

 Defendant was engaging in a heated discussion, or
 “debate,” about a political concern with his Facebook
 friends, which was emotionally charged due to the content
 of the discussion, a dead child, as well as shared feelings,
 very likely incorrect, that D.A. Welch improperly declined
 to prosecute the parents. Facebook has the status of a
 “public square,” but can feel like a “safer” place to discuss
 controversial topics or make inappropriate, hyperbolic, or
 boastful statements. The audience is generally known to
 the person posting, and there is often a sense of community
 and like-mindedness. The record evidence is that every
 response to Defendant's posts on Facebook was supportive
 of Defendant's comments. None of the responses on
 Facebook indicated concern that Defendant might be
 planning to kill D.A. Welch. By posting on Facebook,
 Defendant was expressing his feelings publicly, but
 STATE V. TAYLOR

 2021-NCSC-164

 Earls, J., concurring in part, dissenting in part

 selectively, in the “most important place[ ] ... for the
 exchange of views.”

¶ 86 State v. Taylor, 270 N.C. App. 514, 578–79 (alterations in original) (quoting

 Packingham v. North Carolina, 137 S. Ct. 1730, 1735–36 (2017)). None of the active

 participants in this conversation said or did anything reflecting even a modicum of

 concern that Taylor was imminently planning to physically harm District Attorney

 Welch. The only person who did find Taylor’s messages concerning—the detective in

 the Macon County Sheriff’s Office—was an “unintended recipient[ ]” who “stumble[d]

 upon” the posts, not someone whose reaction is illustrative of what a reasonable

 person would conclude with full knowledge of the surrounding context. Colorado

 ex rel. R.D., 2020 CO 44 at ¶ 60.

¶ 87 Taking this evidence in the light most favorable to the State, a reasonable

 person who encountered Taylor’s statements—and who was familiar with the context

 in which they were made—could, at most, conclude that Taylor communicated a

 statement containing an ambiguous, allusive threat of violence to be carried out in

 some unknown way, by some unknown person, at some unknown time, after the

 occurrence of two vaguely defined events which may or may not have ever occurred.

 That is not the kind of statement the First Amendment allows the State to criminally

 punish. In my view, even when all disputed factual issues are taken in the light most

 favorable to the State, a jury could not have found that Taylor communicated a

 message that a reasonable person would interpret as a threat to harm District
 STATE V. TAYLOR

 2021-NCSC-164

 Earls, J., concurring in part, dissenting in part

 Attorney Welch consistent with First Amendment principles.

 2. The subjective element

¶ 88 The majority also errs in concluding that there is substantial evidence to

 support the conclusion that Taylor possessed a subjective intent to threaten District

 Attorney Welch.

¶ 89 “Intent is a mental attitude seldom provable by direct evidence. It must

 ordinarily be proved by circumstances from which it may be inferred.” State v. Bell,

 285 N.C. 746, 750 (1974). Here, the circumstances overwhelmingly and exclusively

 support the conclusion that Taylor intended to communicate his outrage over what

 he saw as District Attorney Welch’s (and the broader criminal justice system’s)

 malfeasance, not to threaten District Attorney Welch with violence. As described

 above, I do not believe Taylor’s indirect language is itself indicative of any intent to

 threaten. Neither is the context in which the purported threats were communicated.

 Taylor’s boastful, hyperbolic string of Facebook posts, which he quickly deleted,

 supports the conclusion that he was blowing off steam, not that he was seeking to

 make District Attorney Welch fear impending bodily harm. The fact that he chose

 profane, offensive, and opprobrious words to communicate his message does not

 convert what can only be understood as a “crude offensive method of stating a political

 opposition to” District Attorney Welch’s actions into a true threat against her life.

 Watts, 394 U.S. at 707.
 STATE V. TAYLOR

 2021-NCSC-164

 Earls, J., concurring in part, dissenting in part

¶ 90 Taylor’s actions after communicating the statements are also relevant in

 assessing his subjective intent. Cf. State v. Biggs, 224 N.C. 722, 726 (1944) (“[P]roof

 of the commission of like offenses may be competent to show intent, design, guilty

 knowledge, or identity of person or crime. This rule applies equally to evidence of like

 offenses committed subsequent to the offense charged.”) (citation omitted). His

 actions provide no support for the inference that he intended to threaten District

 Attorney Welch.

¶ 91 First, Taylor deleted his Facebook posts shortly after they were published.

 Second, Taylor was fully cooperative with law enforcement investigators and

 immediately disclaimed any intent to threaten District Attorney Welch when

 questioned by the SBI. Cf. Ivers, 967 F.3d at 719 (“[W]hen deputy marshals later

 confronted [the defendant] about the [purported threat], he initially refused to speak

 with them; shouted at them; referred to [the victim] by a racial epithet; . . . and

 confirmed that he remained ‘crazy fucking angry.’ ”). Third, Taylor tried to apologize

 to District Attorney Welch as soon as he learned his messages had caused her

 distress. Cf. State v. Trey M., 186 Wash. 2d 884, 907 (2016) (“[The defendant’s] failure

 to acknowledge that shooting the boys would be wrong [ ] argue[s] in favor of this

 being a true threat. Further, [the defendant] repeated his plan to kill the boys to [the

 investigating officer], who also testified regarding the plan's depth of detail, [the

 defendant’s] demeanor, and [the defendant’s] absence of misgivings about what he
 STATE V. TAYLOR

 2021-NCSC-164

 Earls, J., concurring in part, dissenting in part

 was planning.”). While it is possible that a defendant could act with a fleeting intent

 to threaten violence, there is not “relevant evidence that a reasonable person might

 accept as adequate” to support the conclusion Taylor intended to threaten District

 Attorney Welch at the time he published his posts. State v. Garcia, 358 N.C. 382, 412

 (2004).

¶ 92 The evidence the State relies upon in challenging this conclusion is minimal.

 According to the State, the evidence Taylor intended to threaten District Attorney

 Welch with death or bodily harm is that he described his posts as threats, he texted

 a friend his posts might get him in “[t]rouble with the law,” and he asked his Facebook

 friends to “share” his posts on District Attorney Welch’s Facebook page. As the Court

 of Appeals correctly observed, none of this evidence is evidence supporting the

 reasonable inference that Taylor “had the specific intent to threaten D.A. Welch, i.e.,

 that Defendant intended D.A. Welch to believe he was actually planning to kill her.”

 Taylor, 270 N.C. App. at 569–70.

¶ 93 Assuming the evidence does support the inference that Taylor considered his

 posts to be “threats”—and that he wanted District Attorney Welch to learn of his

 posts—these inferences do not answer the question of what message Taylor believed

 the threats contained which he hoped District Attorney Welch would receive. Not all

 threats are criminally proscribable. The content of what is being threatened matters.

 Had Taylor posted a message promising that if District Attorney Welch did not
 STATE V. TAYLOR

 2021-NCSC-164

 Earls, J., concurring in part, dissenting in part

 prosecute the parents of the children who died he would organize nightly protests

 outside of her house, or a message promising to run against District Attorney Welch

 in a future election if she did not change course, it might be reasonable to conclude

 Taylor communicated a threat with the intent to instill fear. Yet, obviously, in neither

 of these circumstances would it be possible to conclude Taylor communicated a threat

 against District Attorney Welch in a manner which satisfies the elements of the true

 threats analysis.

¶ 94 Similarly, Taylor’s apparent belief that his posts might lead to attention from

 law enforcement is not, in this context, evidence of Taylor’s subjective intent to

 threaten. Read together, Taylor’s messages reflect his profound distrust in Macon

 County’s law enforcement officials and its judicial system. His text to a friend that

 his posts might get him in “trouble” is indicative of his beliefs about local law

 enforcement. There is no evidence supporting the conclusion that Taylor believed he

 would get in “[t]rouble with the law” because he knew he had just threatened District

 Attorney Welch’s life.

¶ 95 The evidence presented by the State supports nothing more than “mere

 speculation or conjecture” that Taylor communicated his messages with the specific

 intent of threatening District Attorney Welch. State v. Polke, 361 N.C. 65, 72 (2006).

 Holding the State to its burden is especially important where, as in this case, failure

 to do so can chill protected speech and therefore comes at the cost of all North
 STATE V. TAYLOR

 2021-NCSC-164

 Earls, J., concurring in part, dissenting in part

Carolinians’ First Amendment rights. Absent substantial evidence of Taylor’s intent

to threaten District Attorney Welch, the majority disserves the First Amendment

principles it purports to uphold by speculatively reaching for a conclusion the

evidence does not reasonably support. Therefore, I dissent from the portion of the

majority opinion holding that the State has presented substantial evidence to support

the conclusion that Taylor communicated a true threat to District Attorney Welch.